IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARGARET T. HUNTER and : | |
| JOHN P. HUNTER, wife & husband, : | |
| : | |
| Plaintiffs : | CIVIL ACTION |
| : | |
| vs. : | MEDICAL NEGLIGENCE |
| : | |
| RICHARD P. KENNEDY, M.D.; : | |
| MONROE RADIOLOGY IMAGING, : | |
| P.C., and POCONO HEALTH : | JURY TRIAL DEMANDED |
| SYSTEM Now Known as Lehigh : | |
| Valley Health Network, : | |
| : | |
| Defendants : | NO. 3:17-CV-00007 |

**Plaintiffs' Motion on Points for Charge**

Under Article III and the Erie Doctrine, a Federal Court exercising diversity jurisdiction must apply state law, as determined by the state's highest Court, on questions of substantiative law such as damages law. Erie R.R. v. Tompkins, 304 U.S. 64 (1938); Klaxon Co. v. Stantor Elec. Mfg. Co., 313 U.S. 487 (1943). The State's Highest Court is the best authority on its own law. Erie R.R. v. Tompkins, 304 U.S. 64 (1938); See, e.g., Butta v. Geico Cas. Co., 383 F. Supp. 3d 426 (E.D.Pa. 2019). (Pennsylvania Supreme Court has not generally adopted the suggested standard jury instructions).

If a charge on mitigation is given which Plaintiff opposes, Plaintiff submits that the Court should either charge the jury on the 4th Edition of the Pennsylvania Standard Civil Jury Instruction 7.100 (attached) or charge on specific points discussed herein. Plaintiff objects to charge on the 5th Edition of the Pa.S.J.I. (Civ) 5th Ed., Sec. 7.100. This charge was not even in existence on June 8, 2016, and does not accurately set forth in the Pennsylvania Supreme Court's decision and law on the issue.

The Pennsylvania Supreme Court has expressed its viewpoint on the issue a number of times that while a plaintiff is generally required to seek medical care to mitigate damages, if some procedure comes with it a risk of failure, a plaintiff is not required to undergo that procedure." Dr. Smith also offered a conservative route which Mrs. Hunter took. She did not refuse treatment! Dr. Smith treated and discussed ATTEMPTED ORIF or Delta Frame (not percutaneous surgery). "There are much higher risks associated with that because of the length of time we were out at this point." (Smith, Page 14, ll. 9-22). The delayed surgery that was presented by Dr. Smith, an open reduction and internal fixation procedure, is subject to significant risk because it can result in surgical fracture, cause wound dehiscence infections, and potentially loss of a limb. Mrs. Hunter had a right to not undergo surgery. Bartunek v. Koch, 170 A.2d 563 (Pa. 1961);

James v. Ferguson, 162 A.2d 690 (Pa. 1960); Potts v. Guthrie, 127 A. 605, 607 (Pa. 1925), *supra*. It is undisputed that Mrs. Hunter presented with moderate swelling on June 8, 2016 to Dr. Kelly Smith. Dr. Smith testified that on June 8, 2016, Mrs. Hunter continued to suffer from moderate non-pitting edema on June 8, 2016. (Smith, Page 38, L. 25 – Page 39, L.2). Moderate swelling, or swelling generally "increases the risk of not restoring the anatomical alignment, wound dehiscence, or surgery failure. (Smith, Page 39, LL.11-19). There was potential that Mrs. Hunter would end up worse. (Smith, Page 13, L. 15).

Plaintiffs' experts, Dr. Hasselman and Dr. Smith testified that performing surgery on a swollen knee can cause problems with wound dehiscence, infection, and loss of limb. It was **undisputed** that on June 8, 2016, Mrs. Hunter had moderate swelling in her left heel. Even Dr. Humbyrd admitted the risks of surgery on cross-examination.

> Q: It's documented that delay from time of injury to the time of surgical intervention is a risk factor for poor results of calcaneus fractures?
> A: So it is a more complicated surgery. But we try and have, in general, **enough delay so that swelling has resolved**. So, it is more dangerous if you're truing to fix it, you know three days after injury when the foot is incredibly swollen than coming back 10, 14 days later in order to take care of a fracture that is not now settled down with the soft tissue heal. Because if someone gets a wound, that's a limb-threatening injury.

XXX

> Q: People could lose their limb if they are operated on a swollen foot, correct?
> A: Correct.
> Q: Because operating on a swollen foot could cause increased risk of infection, correct?
> A: It's more that it increases the risk of a wound which could lead to an infection, but I think that's what you meant.
> Q: Well – so you want – 'so swelling is a risk factor of a poor result, correct?
> A: Correct.
> Q: And on June 8, 2016, Mrs. Hunter was documented as having moderate swelling in her foot, correct?
> A: Correct.
> Q: And Dr. Smith advised Mrs. Hunter that that was a risk for problems, correct?
> A.: Correct.
> Q: That she was concerned about it, correct?
> A: Correct.
> Q: And so – and you've heard the testimony that surgeons want to perform surgery within seven to 14 days to allow the swelling to reduce, but her – to calm down, but before the – the healing becomes advanced of the bones, correct?
> A: Correct. We say that fractures start to become sticky. It doesn't mean that they are calcified, but there is early healing of the hematoma, the blood that's around it, and the fractured pieces start to stick together more --…

(HumbyrdN.T. P. 40 L. 18 – P. 42 L. 16

Dr. Smith explained that there was potential that the result should be worse. (Smith, Pg. 13, L. 3-14).

**Defense Expert Dr. Humbyrd**

Dr. Humbyrd's Deposition should be excluded in its entirety because it is misleading, and she went beyond the scope because a Plaintiff is only

4

required to undergo a simple and safe operation, which does not involve a risk of worsening her condition with a limb-threatening condition.  (See Humbryd N.T. P 41 L. 8-11) See, Potts v. Gutherie, 127 A. 605, 607 (Pa. 1925); James v. Ferguson, 162 A.2d 690 (Pa. 1960); Bensinger v. Roadlink USA Nat'l LLC, No. 04400 (Philadelphia CCP, January 19, 2010)(citing Bartunek v. Koch, 170 A.2d 563 (Pa. 1961).  See Smith Trial Transcript, January 7, 2022, Page. 13 L. 24 – Page. 14 L. 22; Page. 15 LL. 20-24; Page 16 LL. 1-5; Page 19 LL. 8-18; Page 19 L. 19 – Page 20 L. 3; Page 20 LL. 14-18; Page 38 L. 11 – Page 40 L. 20.

If the charge is given over the Plaintiffs' objection, it is well established that in considering the mitigation of damages, the jury should be instructed to consider that if Plaintiff's emotional condition caused from the subject injury can negate a Plaintiff's duty to mitigate in causing damages when considering damages.  Botek v. Mine Safety Appliance Corp., 531 Pa. 160, 611 A.2d 1174 (1992). (See Smith, Page 14, L.1, N. 5).

A Plaintiff has no duty to undergo a serious operation that has risk of failure.  James v. Ferguson, 162 A.2d 690 (Pa. 1961); Potts v. Gutherie, 127 A. 605, 607 (Pa. 1925).  The jury should be instructed on this point.

In determining mitigation, the jury should consider the risk of failure of surgery that Plaintiff was presented.  Although the risk doesn't have to be

caused by negligence, in this case, the negligence caused the increased risk of failure and complications that Mrs. Hunter was presented on June 8, 2016.  So the defendants caused increased risk and now are actively trying to profit from that increased risk.  Margaret Hunter was left with a Hobson's Choice, with a doubtful outcome.

If a serious, or difficult operation, carries some risk of failure, the Plaintiff is not bound by law to undergo it.  In this case, undisputed evidence is that there is an increased risk of complications for ORIF, bad result and failure caused by the delay.  James v. Ferguson, 162 A.2d 690 (Pa. 1961); Bartunek v. Koch, 404 Pa. 1, 5-6, 170 A.2d 563 (Pa. 1961); Restatement (Second) of Torts § 918 (1).

Additionally Attorney Feeney sought to exceed Dr. Humbyrd's three sentence report, and confuse the jury by introducing a surgery that had not been offered to Mrs. Hunter on June 8, 2016, (Humbyrd, Pg. 27, L. 18) or a referral that had not been offered at that point- perhaps to try to confuse the jury. (Humbyrd, Pg. 43, L. 18 – Pg. 44, L. 6).  On cross, Dr. Humbyrd admitted that the surgery had not been offered.  Her testimony should be excluded as a matter of law as irrelevant and beyond the scope of the 3 line report defense gave Plaintiffs on Thursday and Friday.

The Pennsylvania Suggested Jury Instructions haven't been adopted as binding by the Pennsylvania Supreme Court.  Jeter v. Owens-Corning Fiberglas Corp, 716 A.2d 633 (Pa. Super 1998).  Plaintiffs object to the Fifth Edition being given because it does not require the Plaintiff's **conduct** to be unreasonable under the circumstances.  The Fourth Edition, where language was in effect in 2016 should be given if the charge is given at all.

While a plaintiff is generally required to seek medical care to mitigate damages if some procedures come with it a risk of failure, a plaintiff is not required to undergo that procedure."  Bensinger v. Roadlink USA Nat'l LLC, No. 04400 (Philadelphia CCP, January 19, 2010)("while a plaintiff is generally required to seek medical care to mitigate damages, if some procedure comes with its risk of failure, a plaintiff is not required to undergo that procedure.")(relying on Bartunek v. Koch, 170 A.2d 563 (Pa. 1961)).

The undisputed risks that the Plaintiff, Mrs. Hunter was advised by Dr. Smith included:

1.   Not returning anatomic alignment (Smith, P. 39, LL. 13-15);

2.   Risk of failure, lack of success of surgery;

3.   Complications caused by delay;

4.   Wound dehiscence (Smith P. 9, L. 20 – P. 10, LL. 13-14);

5.   Risk of infection (Smith, P. 10, LL. 18-19; Humbyrd, P. 47);

6. Risk of bone infection; (Smith, P. 10, LL. 22; Humbyrd, P. 47);

7. Risk of amputation (Smith, P. 102, LL. 23-25; Humbyrd P. 47, LL. 6-8);

8. Risk of worsening of condition (Smith P. 9, L. 10; P. 13, LL. 13-17);

9. A need for additional procedures (Smith P. 16, LL. 6-19; Deltaframe)

**Further risks include:**

10. Inexperience of the physician (Humbyrd P. 42, LL. 22-25)

11. Psychological conditions of the Plaintiff under the circumstances including chronic pain (Smith P. 14, LL. 24-25).

The Plaintiff was never offered a percutaneous approach as Dr. Humbyrd tried to interject into the record (Humbyrd, P. 22, L. 18) or a referral to another facility. (Humbyrd, P. 43, LL. 18-23). This was beyond the scope of Dr. Humbyrd's three sentence report and should be excluded. Plaintiff was given a continuing objection. Also, a Plaintiff is under no duty to mitigate damages where the defendants conduct is reckless, or in reckless disregard of the safety of the Plaintiff. Dr. Kennedy recklessly disregarded this fracture lines on the May 16, 2016 x-ray.

Dr. Obeng's sending Mrs. Hunter back to work, with driving, increased the swelling in the foot and ankle, causing it to spread up her leg (Dr. Obeng Note, 5/31/16). She was swollen on June 8, 2016, when Dr. Smith first saw her.

It is dangerous for surgeons to operate on a swollen foot. (Humbyrd, P. 59, LL. 16-17). It raises the risk of wound splitting apart, not getting anatomic alignment, increased risk of failure of surgery, wound and infections, osteomyelitis, a bone infection, and potentially amputation. (Dr. Smith, P.9, L. 7; Humbyrd, P. 41, LL. 12-16.)

These facts are **undisputed** based on the record. Under the circumstances, mitigation of damages charge should not be submitted to the jury. James v. Ferguson, 162 A.2d 690 (Pa. 1961). In James v. Ferguson, then Justice Eagen later Chief Justice Eagen, wrote on behalf of the Pennsylvania Supreme Court that while an operation may correct the condition of the plaintiff, and in view of the serious routine risks of the surgery, the Plaintiff should not be forced to undergo it. See Restatement (Second) of Torts § 918 (7).

Further, the jury can consider the emotional state of the plaintiff in determining whether the plaintiff's actions are understandable under her

9

circumstances. Botek v. Mine Safety Appliance Corp., 531 Pa. 160, 611 A.2d 1174 (1992).

A jury may consider the circumstances of the Plaintiff's emotional state caused by the injury of the Plaintiff in exercising failure to mitigate damages. Botek v. Mine Safety Appliance Corp., 531 Pa. 160, 167 n.3, 611 A.2d 1174, 1177 n.2 (1992).

Dr. Smith, Dr. Hasselman and Dr. Humbyrd testified why it's more difficult to perform calcaneus repair surgery under the circumstances of her care by June 8, 2016.

**Hasselman: Page 90, II. 11-25**

"A.   Ok.  So let me – let me explain to you why it's more difficult.

So the calcaneus bone is just like an egg.  It is incredibly strong as long as it's in its right position.  So just like an egg, believe it or not, if you put it on its end appropriately, an elephant can stand on it and it won't break.  It's incredibly strong.

But if it's broken, it cracks into pieces, and so the problem with it is you have these pieces ad not they're stuck together.

So it should be hard enough after an egg is cracked to try to put it back together.  Now I'm going to tell you the yolk on the inside is really,

really sticky and hard and you've got to put it back together without cracking the shell even more."

**<u>Hasselman: Page 94, ll. 1-6</u>**

"A.   No. if she had been splinted, elevated, and told to be completely elevating, that would have allowed the soft tissues to settle down in a timely fashion so that surgical procedures could proceed within the 14 days and you wouldn't need the external fixator or any of those devices."

**<u>Hasselman: Page 93, ll.16-21</u>**

"A.   …after being told that the surgical treatment would be very difficult and that you may end up with an external fixator on your leg, you may end up with plates and screws on the inside, this is going to be very difficult, you will have swelling, she opted to proceed with nonsurgical treatment."

**<u>Hasselman: Page 100, l.24 – Page 102, l.7</u>**

"A.   They're excellent.  So Sanders, Roy Sanders, described this classification years ago talking about the – and it's for exactly this, a displaced intra-articular calcaneus fracture, and so he groups them as 1, 2, 3, depending on the number of fracture lines, and then A, B, C, based on

where along the subtalar joint – where the crack occurs … on the subtalar joint.

So basically, what you're trying to do – that's his classification. So it goes everything from 1A all the way down to 3C.

And so in this case, it would describe a fracture, a 2A, which is a -- two fractures of the posterior facet with the fracture occurring through the posterior facet or the joint surface more lateral than medial.

And so when – the reason he made this classification is because then we, as surgeons, can tell a prognosis to our patients.

So if we have a 3C fracture, I can tell a patient, you know, I can go back and put it together. You're probably not going to do very well. You'll still get arthritis.

Whereas if you have a 2A, if I go in and fix it, the studies should you will do very well and have a very low risk of fracture.

So I can tell, as a surgeon tells a patient, you have a 2A Sanders fracture. If I fix this, your chances of getting posttraumatic arthritis are very high. Ad then I let the patient make their decision."

**Hasselman: Page 102 I. 25 – Page 103, I. 7**

"A.   Absolutely, because again, back to what I said, if the pieces have started to mend together, you could actually create more fractures

trying to pull the pieces back together. So you could actually take her from a Sanders 2A to a Sanders 3 or 3C, because you're breaking pieces apart while you're just trying to separate fractures. So, yes, it is much more difficult and dies not have the same prognosis."

**Hasselman: Page 104, ll. 16-20**

"A. So although smoking is documented as one of the risk factors for wound healing and complications of surgery, it's been well shown by Roy Sanders and others that you really have to get to two packs a day of smoking before you can see those types of complications."

**Hasselman: Page 108, l. 22 – Page 109, l. 2**

"Q. And if Margaret had timely surgery, timely diagnosis and timely surgery, would she have had a better opportunity of avoiding the development of posttraumatic arthritis and undergoing the – or having the need for a subtalar fusion?

A. Yes, absolutely.

**Hasselman: Page 159, l. 23 – Page 160, l. 2**

"Q. And had the surgery been done, it's possible Mrs. Hunter could have avoided some of the problems which she now indicates she has. Fair to say?

A. It's possible. It's probable she'd be worse."

**Hasselman: Page 163, l. 14 – Page 164, l. 3**

"Q.   And is there a test that you're supposed to do, like, in order to determine whether or not a patient is ready for surgery called a "wrinkle test"?

A.   Correct. So, yes, it's called the "wrinkle test", and you – the skin needs to be wrinkled.

Because as we talked earlier, when a calcaneus breaks, there's massive swelling, and it's really not safe to operate until you have that wrinkle sign – is what we call the "wrinkle sign". The skin starts to wrinkle. This means the swelling is going back down and it's safe to operate.

Q.   Is there at indication there that there was a wrinkle sign at this point?

A.   No.

**Hasselman: Page 166, ll 17-25**

"Q.   Okay. Does it say there that it's positive for moderate amount of edema lft foot and ankle?

A.   Yes, it's – it's – right. Nonpitting edema, correct, of the foot and ankle, right.

Q:   What does that mean?

A.   So "non-pitting edema" means that the soft tissues are full of

water, moderate amount.

      So a mild amount would be a small amount".

### Hasselman: Page 167, ll. 3-5

"A moderate amount means that there's still a lot of fluid in the foot and ankle. It's still dangerous to make incisions at this point."

### Hasselman: Page 168, ll.21-24

"Would Mrs. Hunter have been in this position if a diagnosis had been made on May 16, 2016, by Dr. Kennedy on the x-ray at Pocono Medical Center?

    A:    No, she would not.

### Hasselman: Page 172, ll 21-24

"A.    Yes. So the answer is yes, she is at risk that she could have been made worse. This was a difficult operation, which is why twice Dr. Smith says 'attempted'."

The undisputed evidence is that the surgical operation would not cure the Plaintiff. The operation(s) were a serious operation necessarily attended with some risks of failure. The Plaintiff is not bound in law to undergo a serious and critical surgical operating which would necessarily be attended with some risk of failure? Kehoe v. Allentown & L. V. Traction Co., 41 A. 310, 312 (1898).

This statement was reaffirmed as a correct expression of the test in Bartunek v. Koch, 170 A.2d 563 (Pa. 1961).

Additionally, if the Plaintiff suffers emotional injury as a result of the injury caused by the defendant(s) misdiagnosis, the jury cannot consider mitigation of damages. Botek v. Mine Safety Appliance Corp., 531 Pa. 160, 611 A.2d 1174 (1992).

Where the issue of mitigation of damages is in doubt, the injured party has no duty to mitigate, H.J. Stern Industries v. Richter Communications, 314 A.2d 345 (Pa. Super. 1978).

An injured party is "required to exercise no more than reasonable judgment or fortitude." Down v. Scott, 191 A.2d 908, 911 (Pa. Super. 1963).

The defendant has the burden of establishing that Plaintiff's treatment decisions were unreasonable, considering all of the risks of failure, complications, need for additional procedures or any other consideration that the evidence supports.

Plaintiffs request the Court instruct the jury on Restatement (Second) of Torts Section 918(2) which precludes the defense of ***mitigation of damage*** where "the tortfeasor intended the harm or was aware of it and was recklessly disregardful of it, unless the injured person with knowledge

of the danger of the harm intentionally or heedlessly failed to protect his own interests.

                                Respectfully submitted,

                                FOLEY LAW FIRM

                    By:   /s/ Michael J. Foley
                                Michael J. Foley, Esquire