IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARGARET T. HUNTER and          :
JOHN P. HUNTER, wife and        :
and husband                     :
                                :
                Plaintiffs      :        CIVIL ACTION
                                :
        vs.                     :        MEDICAL NEGLIGENCE
                                :
RICHARD P. KENNEDY, M.D.,       :        JURY TRIAL DEMANDED
MONROE RADIOLOGY IMAGING,       :
P.C., POCONO MEDICAL CENTER,    :
PETE OBENG, M.D., FAMILY CARE   :
CENTERS, INC. t/d/b/a PMC       :
PHYSICIAN ASSOCIATES and        :
PMC IMMEDIATE CARE CENTER       :
                                :
                Defendants   :        NO.  3:17-CV-00007

PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO MOTION CHALLENGING THE VERDICT

This Honorable Court should not override the historic constitutional

role of the jury as finder of fact on evidentiary issues, because this jury

verdict, under the overwhelming evidence submitted, cannot possibly

"shock the conscience of the Court", which is the standard the Defendants

must satisfy.  7th Am. U.S. Const.   There was overwhelming evidence of

the permanence and severity of the Plaintiff's injury, which necessitated

future medical treatment.[1]  *See*, Pratt v. Stein, 444 A.2d 674, 677 (Pa.

---

[1]    In Pratt v. Stein, the Superior Court reasoned:

Super. 1982) (cited with approval in the Noted to the Pennsylvania Standard Jury Instructions,15[th] Ed.) From that evidence the jury had the power and authority to make finding and inferences of fact from the evidence to support their emphatically unanimous award. Mathematical precision is not required of the jury when making assessments of future damages, particularly where a trial was continued and interrupted for 12 days at the request of the defense.  The plaintiffs should not be prejudiced.

More importantly, the Defendants simply waived the molding argument by failing to object while the jury was empaneled. The jury had been empaneled since December 6, 2021. After Foreman Evanston read the unanimous jury, that had served, and remained serving, from Dec 6-Jan 19, 2022 (over two defense-initiated continuances, and denied motions for mistrials), this Honorable Court inquired of the parties whether any party had any further motion. The only motion was Attorney Feeney's request to

---

We need only examine one such piece of evidence to satisfy ourselves that an award for future medical expenses would not have been based solely on conjecture, i.e., a $6.00 chiropractic visit.

444 A.2d at 697.

Accord. Rogers v. Philadelphia & R. Ry. Co., 263 Pa. 429, 106-A. 734) (1919)

Jury may base valuation of future medical care based on data point to properly calculate future damages.

poll the jury.  The Court granted Attorney Feeney's request to poll the jury.
Each of the Jurors emphatically reaffirmed their vote in favor of the jury
verdict, in response to Mr. Feeney's request.

At that point. Judge Saporito again requested the parties if they had
anything else. Neither Atty Feeney on behalf of the Kennedy Defendants,
nor Attorney Wenner voiced any objection or motion to challenge the
verdict, or mold the verdict. Atty Foley thanked the jury on behalf of
Hunters.

At that point, Judge Saporito advised the parties whether there was
any objection or other issue because Judge Saporito announced his
intention to interview the jury, to conduct a sort of post-trial quality control
discussion with the jury, to learn their concern and viewpoints about the
Court process, in this Covid era.

This effectively ended the jury's ability to act to review the verdict,
and ended the ability of any party to issue a challenge to mold the verdict.

Apparently, off the record, Judge Saporito then met the jury for quite
a while.  The issue was waived.  Only after the jury left was an issue raised.

The evidence supports the jury's verdict on the issue of medical
damages.  This Honorable Court, in its discretion, should deny the

- 3 -

Defendants' belated motion to remand the verdict.  Review of the evidence

submitted demonstrates that the jury's verdict was actually conservative,

not excessive.  Any errors committed during the course of a trial cannot

justify the grant of a new trial unless they affected the substantial rights of

the parties.  Wells v. Loizos, 2015 U.S. Dist. LEXIS 19085*, 2015 WL

685126.  Any objections to the form of the damage verdict must be made

when it is rendered, or it is waived.  Holliday v. Page, 440 Pa. Super. 490,

656 A.2d 136 (Pa. Super. 1995)[2]; East Broad Top Transit Co. v. Flood, 326

Pa. 353, 192 A. 401 (1937).

    In Pratt v. Stein, 444 A.2d 674, 697 (Pa. Super. 1982)[3] the

Pennsylvania Superior Court held that medical expenses may be

---

[2] **The lower court decision was affirmed.  The court held that since appellant did not object to the response given by the juror before the jury was discharged, a challenge to the validity of the verdict on that basis would not be entertained by the court.**  The court held that failure to object to an ambiguous or flawed jury verdict prior to the dismissal of the jury would result in the waiver of that claim on appeal.

[3] "Instantly, although the record is replete with evidence regarding the treatment which appellee received up to and including the time of trial, we need only examine one such piece of evidence to satisfy ourselves that an award for future medical expenses would not have been based solely on conjecture.  Appellee established that he was treated by Dr. DePativo a chiropractor, from 1973 to May of 1977.  Appellee visited Dr. DePativo's office during this period on at least one-hundred-twenty (120) separate occasions at a cost of six dollars ($6.00) per visit.  (N.T. 2323).  Dr. DePativo testified that said treatment was necessary to alleviate muscle spasms in appellee's neck and back, which spasms he attributed to appellee's constant use of canes. (N.T. 2324).  By virtue of the permanent nature of his disability, appellee will necessarily continue to use crutches or canes in the future.  Thus, the jury could reasonably have inferred that appellee would require chiropractic treatment with the same frequency as he had in the past.  Given the

appropriately recovered where the jury could infer that the Plaintiff would require future medical treatment based on evidence of the permanent nature of the disability. *Id.* Under the evidence submittal at trial, the jury properly could determine that Mrs. Hunter had multiple surgeries in her future. (*See*, Hasselman II, p. 19, l. 5-23, 1/18/22)  Dr. Hasselman testified that the cost of a foot surgery was approximately $80,000 to $100,000. (*See*, Hasselman I, p. 123, l. 21-25; p. 125, l. 2-6; pp. 109-110; p. 112; pp.110-113; p. 108, l. 2-13)

Plaintiff's evidence that Mrs. Hunter suffered a permanent disability presented a basis for the jury to conclude that Mrs. Hunter will require a lifetime of medical care, including medical visits, injections, and multiple orthopedic surgeries.[4]  Pratt v. Stein, 444 A.2d at 697.  Evidence was admitted about the probability of future subtalar fusion surgery and for

---

cost for appellee's past chiropractic treatment and the probable number of visits he will require in the future, there was ample evidence from which the jury could have determined appellee's probable future medical expenses and, therefore, the court's charge on that issue was appropriate." **Pratt v. Stein**, 444 A.2d 674, 697 (Pa. Super. 1982).

[4] Pennsylvania damage law applies to this case under the Erie Doctrine and Article III of the U.S. Constitution. Erie R.R. v. Tompkins, 304 U.S. 64 (1938); Eshelman v. Puma Biotechnology, Inc., 2 F.4th 276 (4th Cir. 2021) (Court applies State Law standards for review of a verdict in diversity action); Gasperini v. Ctr. for Humanities, 518 U.S. 415, 435, 439 (1996); Butta v. Geico Cas. Co., 383 F.Supp.3d 426 (E.D.Pa. 2019). (Standard Jury Instructions not binding.)

ankle treatment, surgery for plantar fasciitis and injections. (*See*, Hasselman II) Victims must be compensated for all the harm they suffer from the of another wrongdoing. Zieber v. Bogert, 565 Pa. 376, 773 A.2d 758 (2001); Spangler v. Helms New York Pittsburgh Motor Express, 395 Pa. 482, 153 A.2d 490 (1959).  Based on the cost of subtalar joint surgery, $80,000 to $100,000, the jury could infer the amounts for the other surgeries.  See, Pratt v. Stein, 444 A.2d 674 (Pa. Super. 1972) (jury allowed to infer factual care based on costs of a single doctor visit). *Accord.*

In Flagiello v. Pennsylvania Hospital, 417 Pa. 486 (1965), the Pennsylvania Superior Court stated that insistence upon respondent superior and damages for negligent injury serves the twofold purpose, for it assures payment of an obligation to the person injured and gives warning that justice and the law demand exercise of care.

Judge Saporito specially instructed the jury that it was allowed to make inferences of fact from the evidence.  Pratt v. Stein, 444 A.2d 674, 697 (Pa. Super. 1982) (quoting, Boyle v. Pennsylvania R.R. Co., 403 Pa. 614, 170 A.2d 865, 867 (1961) (a doctor may be properly allowed to explain the possible effects of an injury with less certainty than is required of opinion

- 6 -

testimony on causation).); <u>Spangler v. Helms New York Pittsburgh Motor Express</u>, 395 Pa. 482, 153 A.2d 490 (1959); <u>Bigelow v. RKO</u>, 327 U.S. 251, 265 (1946).  The Defendants' objections to the verdict simply challenge the jury's proper and constitutional role as finders of fact.

The Defendants failed to timely make a motion to mold the jury verdict until after the jury had been discharged, and the jury had actually been interviewed by the Court without defense objection.  This constitutes a waiver.

The Pennsylvania Supreme Court has affirmed that a, "Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant." <u>Botek v. Mine Safety Appliance Corporation</u>, 531 Pa. 160, 611 A.2d 1174 (Pa. 1992), <u>Potochnick v. Perry</u>, 2004 Pa. Super. 393, 861 A.2d 277, 285 (Pa. Super. 2004)

"A jury is given wide latitude to fashion a verdict on damages."  <u>Farese v. Robinson</u>, 222 A.3d 1173, 1189-90 (Pa. Super. 2019) (*citing* <u>Neison v. Hines</u>, 653 A.2d 634 (Pa. 1995). Pa. Constitution Art. 1 Sec.  6.

A jury can pick and choose which evidence to accept or reject which testimony to accept or reject.

Past medical expenses for a single doctor visit can serve as a jury's basis to award future medical expenses.  Pratt v. Stein, *supra*.

In this case, Kelly Smith, DPM, a Board Certified Podiatrist testified that the Plaintiff suffered a permanent disability, as a result of the injury caused by the Defendants' malpractice. (Smith Trial Tr. 23:12-14 January 7, 2022). Dr. Kelly Smith testified that Margaret Hunter sustained a Sanders 2A comminated intraarticular calcaneus fracture on May 16, 2016, in varus position, with a shortened tuber.  The fracture has healed in a malposition (*see,* Hasselman II Trial Tr. 8, 9, 17-19 January 18, 2022).

Dr. Smith testified that Mrs. Hunter's impairments are permanent.  "At this point they're permanent.  We are looking at five years out now, and she's still struggling." (Smith Trial Tr. 23:2-14).  Dr. Smith restricted Margaret Hunter to modified sedentary work at best. (See *Id*. at 17-22).

A jury can infer what the probable consequences of the injury will be and infer damages. There is a presumption of consistency with respect to a jury's findings.  Dr. Smith testified that the left heel injury impaired even sedentary work because "she's been having issues proximally all the way up".  She was having hip and neck issues at one point. (Smith Trial Tr. 24:5).

- 8 -

Margaret has suffered personality changes since her May 16, 2016, injury and as a consequence "[h]er demeanor has definitely changed... one or two years ago, she didn't even want to get anything ready for Christmas, which she said is very unlike her, and … an overall feeling of depression for lack of a better word".  (Smith Trial Tr. 24:18-24).

If Mrs. Hunter had been appropriately diagnosed, this would have given the best opportunity for optimum recovery." (Smith Trial Tr. 17:16-18). (Hasselman II Trial Tr. 17:2 – 18:1).

As a consequence of healing in a mispositioned condition, a varus position, a shortened tuber and a misdiagnosed subtalar joint, Mrs. Hunter is subject to progressive long-term gait abnormalities (Smith Trial Tr. 21:19 – 23:3) to multiple surgeries, including developing progressive arthritis, and that likely can look at fusion of the subtalar joint, ankle replacement, and/or plantar fasciitis surgery.  Amputation was discussed as a risk if a wound developed by the defense expert Dr. Humbyrd.  (Humbyrd Dep. 47:2-13, Jan. 15, 2022). (*See also,* Hasselman II Trial Tr. 19:19-23).

Dr. Smith testified that Mrs. Hunter will most likely need a surgery on the subtalar joint (Smith Trial Tr. 32:16-21).  It is actually scheduled.  In response to Attorney Feeney's question, Dr. Smith testified that when the

subtalar joint is fractured, this places "more stress on the ankle joint because it's completely adjacent to a subtalar joint, and you're locking that joint up.  That's commonly known that that happens." (*Id*. at 33:8-12).

Dr. Hasselman similarly testified that Mrs. Hunter sustained a Sanders 2A impacted comminuted articular fracture of the calcaneus of the left foot. A split depression fracture.  This was a split depression fracture, that extended to the subtalar joints. (*See,* Hasselman I Dep. 76, 81-2, 87 August 16, 2021).[5,6]

Both Defendant Dr. Kennedy and Defendant Dr. Obeng identified an impacted comminuted fracture of the left calcaneus.  Further, at the onset of the trial, the Court instructed the jury that the stipulated facts were that Mrs. Hunter had a severe left foot fracture.  It is well established the jury can pick and choose which testimony to accept, or choose to reject, in whole or in part.  Randt v. Abex Corp., 671 A.2d 228, 233 (Pa. Super. 1996).

---

[5] Dr. Hasselman's Pretrial Deposition was taken and preserved by the Plaintiffs on August 16, 2021, because Plaintiff could not be sure of Dr. Hasselman's availability. This practice is allowed by Federal Rule of Civil Procedure 30.

[6] The Defendants' made alternative arguments.

The body of the calcaneus was in a varus position, and there was a split depression of the posterior facet. (Hasselman I Dep. 87:7-9).   The impacted comminuted fracture included an intraarticular component, which is the subtalar joint between the calcaneus and talus (*Id*. Hasselman I at Page 87).  The varus deformity, where the body of the calcaneus turns inward, caused the patient to walk abnormally (Hasselman I Dep. August 16, 2021 88:8-15).  Dr. Humbyrd testified that every step Mrs. Hunter takes caused microtrauma to her foot.  (Humbyrd Dep. 64:15-19).  Even Dr. Humbyrd, a Defense expert, agrees that Mrs. Hunter needs a subtalar joint operation, and will have severe arthritis.  Her opinion on who was responsible was rejected by the jury.  In conclusion, there is no basis for the conscience of the Court to be shocked.

Dr. Hasselman testified that Mrs. Hunter's chances of getting post-traumatic arthritis were very high as a result of the malpractice, (Hasselman I Dep. 102:2-6) (Hasselman II Trial Tr. 13 11:13 (Feeney Cross)), but would have been substantially reduced if Mrs. Hunter had been properly treated. (Hasselman II Trial Tr. 18).

If the subtalar joint is not properly realigned or restored by surgery, the cartilage surface will not be well aligned, so they will grind and rub, and get

post-traumatic arthritis much more rapidly than if the surface were realigned. (Hasselman I Dep. 105-06).  Post traumatic arthritis has developed in Margret Hunter as a result of the negligence of the Defendants. (Hasselman I Dep. August 16, 2021 106-07).

Because Mrs. Hunter's calcaneus is turned inward in a varus position, and remains shortened, (Hasselman I Dep. August 16, 2021107:14-17), this increases the normal stresses on that joint, as well as causes problems with your normal walk cycle."  This causes injury to the ankle and necessitates future treatment and potentially foot surgery.

The biomechanics of abnormal gait or walking, cause joint deterioration of the subtalar joint, much more rapidly than it normally would. (Hasselman I Dep. August 16, 2021107-08).

Dr. Hasselman testified that Margaret will need a subtalar fusion. (Hasselman I Dep. August 16, 2021 108:22 – 109:2).  Margaret has developed post traumatic arthritis already in the subtalar joint. (Hasselman I Dep. August 16, 2021 109:5-6).  This could have been avoided by proper medical care by Defendants.  (Hasselman I Dep. August 16, 2021 109).  The treatment option is a subtalar fusion. (Hasselman I Dep. August 16, 2021 109:10-20).

Further, Mrs. Hunter has developed plantar fasciitis, heel spurs, as a consequence of the medical malpractice, (Hasselman I Dep. August 16, 2021 110-13), which will likely require surgery.

Further, Dr. Hasselman testified that Margaret Hunter has developed gait problems as a consequence of the malposition of the calcaneus. Hasselman I Dep. August 16, 2021 112).

Margaret has received chiropractic treatments (Hasselman I Dep. August 16, 2021 112:10-11) because of the abnormal gait cycle, caused by the malposition of the calcaneus (Hasselman I Dep. August 16, 2021 112:13-113:10).

The medical testimony establishes that Mrs. Hunter can expect rotational joint problems throughout on the left side of her body, as "the hip bone's connected to the knee bone." (Hasselman I Dep. August 16, 2021 112:13-15).

The abnormality on the subtalar joint and hip joints caused by the malposition alters the rotation of the rotational joints, such as the hip joint.

> "…If you alter the rotation of one or the other, you're going to stress the other.
> "So it's very common that people get hip arthritis and have limited motion of the hip come to see me because their foot's bothering them, and there are people who have arthritis in their foot that have

> problems with their hip and lower back.  And, again,
> that's why a lot of them seek chiropractic care,
> because they get low back pain, side pain, hip pain."

(Hasselman I Dep. August 16, 2021 112:25-113:9).

X-Rays taken on April 9, 2021, by Dr. Smith showed degeneration of the subtalar joint.  (Hasselman I Dep. August 16, 2021 113:12-15).

Mrs. Hunter has developed arthritis of the subtalar joint over time (Hasselman I Dep. August 16, 2021 114:12-14), as well as plantar fasciitis (Hasselman I Dep. August 16, 2021 114:19-20).  Dr. Hasselman testified to a reasonable degree of medical certainty that the increased risk of arthritis and plantar fasciitis was caused, accelerated, or aggravated by the failure of Margaret to get a proper diagnosis of the May 16, 2016 X-Ray, and initiation of proper treatment thereafter. (Hasselman I Dep. August 16, 2021 114:21-115:13).

Dr. Hasselman explained that Mrs. Hunter's heel bone broke, and went into varus which means that the heel has turned inward instead of the normal slightly extended.  (Hasselman Trial Tr. 9:14-19 January 18, 2022).

Mrs. Hunter has two problems, first is the joint and second is the deformed heel bone.  If you fuse the joint, her heel bone is still going to be turned in (in "varus").  (Hasselman Trial Tr. 9:20-24 January 18, 2022).

- 14 -

When the subtalar ankle is fused, you are taking away the side-to-side motion of the ankle.  (Hasselman Trial Tr. 10:5-15 January 18, 2022).  When you lose that motion, the ankle joint and the other two joints in the foot called the talar navicular and calcaneal cuboid have to compensate for the lost motion from the subtalar joint.  People who have subtalar fusions more often than not within twenty years will develop ankle arthritis and arthritis of the talar navicular and the calcaneal cuboid joint.  (Hasselman Trial Tr. 10:7-19 January 18, 2022).

The subtalar joint after fusion is never a normal ankle.  (Hasselman Trial Tr. 10:13-19 January 18, 2022).

Dr. Hasselman testified that if Mrs. Hunter had been properly and timely treated, she would have only had a 1 in 10 chance of developing subtalar arthritis. (Hasselman Trial Tr. 13:11-14 January 18, 2022).

Dr. Hasselman further testified on cross by Attorney Wenner that Mrs. Hunter now has chronic pain syndrome, which is not just the joint, but the nerve endings around the joint. (Hasselman Trial Tr. 17:6-8 January 18, 2022).  If someone has a painful joint for a period of time.  She was taking gabapentin for pain relief.

- 15 -

Dr. Hasselman testified that Mrs. Hunter is suffering from chronic nerve pain, plantar fasciitis pain, tendon impingement pain, subtalar arthritis pain. (Hasselman Trial Tr. 17:22 – 18:7 January 18, 2022).  Mrs. Hunter was developing problems on her left side with hip and back issues as well.  The jury's verdict was conservative, not excessive.

The compensatory irritation of the other joints such as the calcaneal cuboid joint,

> A.  Yes. So instead of going on to hypotheticals or theoreticals we'll stay straight with Margaret Hunter's case. When your heel is now healed and it's turned inward and the joint is in an abnormal shape, you'll have the pain from the subtalar arthritis, as we've discussed. You'll have pain because of the abnormal position of the heel. As I even discussed in my previous testimony, when the heel is turned inward it locks the front part of the foot so that the normal walking pattern can't occur. This causes pain because the other joints get stressed. The ankle gets stressed, the talar navicular calcaneal cuboid joints get stressed. You also have these chronic pain fibers, so when you deal with pain for a long time the brain actually starts to get used to having that pain there. It's similar to when people talk about phantom limbs, people who have an amputation, they still have pain in their leg even though they don't have a leg. This is chronic pain phenomenon well known. In Mrs. Hunter's case I think she has some of that that as well from living with this for so long.

(Hasselman Trial Tr. 19:5-23 January 18, 2022).

The Pennsylvania Superior Court has stated: "In a personal injury action, however, it is totally within the jury's province to disbelieve or believe all or part of the testimony of any witness and to arrive at a verdict of damages which it determines will compensate a plaintiff for his loss." *See,* Stoughton v. Kinzey, 299 Pa. Super. 499, 504, 445 A.2d 1240, 1243 (1982).

Remittitur can only be applied in extremely narrow and qualified circumstances; the Court's prime directive and duty is still to "enforce the jury's verdict unless the circumstances cry out for judicial interference." *See*, *Id*. at 502, 1242, citing Prather v. H-K Corp., 282 Pa. Super. 556, 423 A.2d 385, 389 (1980) (emphasis added); *accord*, Daley v. John Wannamaker, Inc., 317 Pa. Super. 348, 352, 464 A.2d 355, 358 (1983). The jury's constitutional role and duty in assessing damages must not be interfered unless "it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." Doe v. Raezer, 444 Pa. Super. 334, 341, 664 A.2d 102, 105 (1995), quoting Tonik v. Apex Garages, Inc., 442 Pa. 373, 378, 275 A.2d 296, 299 (1971), *accord*, Canery v. Southeastern Pennsylvania Transportation Authority, 267 Pa. Super. 382, 391, 406 A.2d 1093, 1097 (1979).

The law in Pennsylvania is clear that a Court may not declare an award excessive simply because the Court, sitting in the place of the jury, might have awarded a lesser amount.  Tulewicz v. Septic, 529 Pa. 584, 606 A.2d 425 (1991). (Wrongful death action award $2,500,000.00 resulting from death of a 47 year old wife in 1985 did not shock conscience of court to warrant a remitter.) **"It is well-settled that the large size of a verdict is itself no evidence of excessiveness."** Sprague v. Walter, 441 Pa. Super. 1, 69, 656 A.2d 890, 924 (1995), *appeal denied*, 543 Pa.730, 673 A.2d 336 (1996) (emphasis added), citing Layman v. Doernte, 405 Pa. 355, 363, 175 A.2d 530, 534 (1962).[7]

The Court's only rightful concern is, whether the award of damages falls within the uncertain limits of fair and reasonable compensation." Sprague v. Walter, 441 Pa. Super. 1, 69, 656 A.2d 890, 924 (1995), *appeal denied*, 543 Pa. 730, 673 A.2d 336 (1996), quoting Haines v. Raven Arms, 536 Pa. 452, 456, 640 A.2d 367, 369 (1994).  Moreover, a "proper evaluation of whether a verdict is excessive … eludes fixed standards and facile

---

[7] Notably, even as the punitive award of $31.5 Million was reduced to $21.5 Million in a defamation case – based on considerations unique to a punitive damage award – the compensatory award of $2.5 Million for a damaged reputation in the absence of even one dollar of economic loss was left completely untouched and unremitted. Sprague v. Walter, 441 Pa. Super. 1, 656 A.2d 890, 924 (1995), *appeal denied*, 543 Pa. 730, 673 A.2d 336 (1996).

comparisons with past cases, 'because each case is unique and dependent on its own special circumstances'." Glomb v. Glomb, 366 Pa. Super. 206, 217, 530 A.2d 1362, 1368 (1987), quoting Kemp v. Philadelphia Transportation Company, 239 Pa. Super. 379, 382, 361 A.2d 362, 364 (1976). Likewise, it is well settled that settlement discussions cannot be considered by the trial court in reviewing a motion for a new trial on damages or remitter because it would be unfair to a party acting in good faith in settlement discussions, and it would undermine public policy in favor of encouraging amicable resolution of disputes. Ammon v. Arnold Pontiac-GMC, Inc., 361 Pa. Super. 409, 411-16, 522 A.2d 647, 649-51 (1987). This rule would also apply to post-verdict interview by the Court. A jury cannot impeach its own verdict except in very limited circumstances which are not at issue here.

In Botek v. Mine Safety Appliance Corporation, 531 Pa. 160, 611 A.2d 1174 (Pa. 1992), the Pennsylvania Supreme Court ruled that an award of $50,000.00 per year was not excessive for a total pain and suffering award of $350,000.00 for seven years of mental and emotional ills suffered by a firefighter who blacked out during a simulated fire drill from an airpack and mask that was mistakenly filled with carbon monoxide instead of oxygen.

The Pennsylvania Supreme Court reversed the Pennsylvania Superior Court Order granting a remittitur, despite Plaintiff-Appellee's "actual out-of-pocket medical expenses of $783.05" and the fact that Plaintiff "did not consult with a physician until one year after the incident."  *Id*. at 163, 1175. The unanimous decision of the Pennsylvania Supreme Court held that:

> "The jury in the instant case listened to uncontradicted expert medical witnesses…[that] heard Plaintiff-Appellant testify, and they concluded that Plaintiff-Appellant suffered substantial long term mental and emotional ills as a result of M.S.A.'s admitted negligence.  **They decided to compensate him for that suffering at the rate of $50,000.00 per year [over a decade ago].  That was reasonable and that is where the matter should have ended.**"

Botek, *supra*., 611 A.2d at 1177 (emphasis added).

A substantial verdict, if supported by the evidence, must be permitted to stand and will not be set aside when there is nothing to suggest that the jury was in any way guided by partiality, prejudice, mistake or corruption. Prather v. H-K Corp., 423 A.2d at 389 (citations omitted).[8]

The duty of assessing damages is within the province of the jury and should not be interfered with by the Court unless it clearly appears the amount awarded resulted from caprice, prejudice, particularly, corruption.

---

[8] It is black letter law that jurors cannot impeach their own verdict by testifying what occurred during deliberations.  Pittsburgh National Bank v. Mutual Life Insurance Company of New York, 493 Pa. 96, 425 A.2d 383, 385 (1981).

Dr. Hasselman testified that Mrs. Hunter is definitely going to require injections from time to time, anti-inflammatories and certainly will need surgical intervention. (Hasselman I Dep. August 16, 2021 124:9-12).

Dr. Hasselman testified that **a** surgery costs approximately $80,000.00 to $100,000.00 with all of the additional costs.

Mrs. Hunter testified that her subtalar fusion surgery is scheduled in the next few months.  See Testimony of Margaret Hunter, *See also*, Hasselman Rebuttal Testimony.

Dr. Hasselman testified that Mrs. Hunter will need a surgical intervention on her plantar fasciitis.   (Hasselman I Dep. August 16, 2021 125:2-6).

Mrs. Hunter could have been at "very low risk" for developing post-traumatic arthritis if she had received timely and proper treatment for her Sanders 2A comminuted, impacted calcaneal fracture. (Hasselman I Dep. August 16, 2021 145:5-6).

Dr. Hasselman further testified that after Mrs. Hunter undergoes a fusion of the subtalar joint, she then will place stress on the adjacent joints, and this will cause ankle arthritis, increasing the risk that Mrs. Hunter may need an ankle replacement operation.

This Honorable Court should find that the Defendants waived any assertion to mold this jury verdict by not objecting to the verdict before the jury was dismissed.  *See, e.g.*, Henery v. Shadle, 443 Pa. Super. 331, 661 A.2d. 435 (1995).  Mr. Feeney asked to poll the jury.  The jury individually emphatically reaffirmed their verdict.

Based on Dr. Hasselman's testimony, the evidence supported that Mrs. Hunter will need multiple surgeries as a consequence of the Defendants' negligence including (1) surgery on the subtalar joint; (2) plantar fasciitis surgery; (3) ankle surgery/ankle replacement surgery; (4) hip replacement surgery.

If the jury had been directed to resume deliberations on this issue, they may have readjusted the amount of damages.

It is often recognized that jury can award pain and suffering damages in order to compensate Plaintiffs for damages that do not neatly fit within these categories, and may have recalculated damages if they were asked to reconvene given the opportunity.

Surgeries on the leg, if a wound develops, can be limb threatening. (Humbyrd Dep. 40:18 - 42, Jan. 15, 2022).  Mrs. Hunter would be exposed to all of these risks. The interests of justice lie with Margaret Hunter.

Denying the Defendants' Motion, is to grant a new trial limited to the medical expense verdict. The Defendants should think about that.

Respectfully submitted,

FOLEY LAW FIRM

By:  /s/Michael J. Foley
     Michael J. Foley, Esquire
     Attorney I.D.# 39855
     Thomas J. Foley, Jr., Esquire
     Attorney I.D. #08328
     Kevin P. Foley, Esquire
     Attorney I.D. #53067
     538 Biden St., Ste. 200
     PO Box 1108
     Scranton, PA 18501-1108
     Telephone: (570) 342-8194
     MikeF@FoleyLawFirm.com
     *Attorney for Plaintiffs*