```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2                 WILKES-BARRE DIVISION

 3   MARGARET T. HUNTER, et al.,      ) CASE NO.
                      Plaintiffs      ) 3:17-CV-00007-JFS
 4             vs.                    )
     ELAINE ROSE KENNEDY, et al.,     )
 5                  Defendants        )
     _____ )
 6

 7     TRANSCRIPT OF REBUTTAL TESTIMONY OF DR. CARL HASSELMAN, M.D.
           BEFORE THE HONORABLE JOSEPH F. SAPORITO, JR.
 8                UNITED STATES MAGISTRATE JUDGE
              TUESDAY, 18 JANUARY 2022 - 2:26 P.M.
 9

10   APPEARANCES:

11   For the Plaintiffs:

12       Michael John Foley, Esq.
         Kevin P. Foley, Esq.
13       Foley Law Firm
         538 Spruce Street, Suite 200
14       P.O. Box 1108
         Scranton, PA 18501-1108
15       (570) 342-8194

16   For the Defendants:

17       Eugene P. Feeney, Esq.
         Weber, Gallagher, Simpson, Stapleton, Fires & Newby, L.L.P.
18       201 Penn Avenue, Suite 400
         Scranton, PA 18503
19       (570) 961-2099

20       Neil E. Wenner, Esq.
         Gross McGinley, L.L.P.
21       33 South 7th Street
         Allentown, PA 18101
22       (610) 820-5450

23

24

25
```

1    APPEARANCES (Continued)

2

3

4

5

6

7

8

9

10

11

12    **Court Reporter**:

13        Wesley J. Armstrong, RMR
          Official Court Reporter
14        U.S. Courthouse & Federal Building
          228 Walnut Street
15        Harrisburg, PA 17101
          (717) 542-5569

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by machine shorthand; transcript
      produced by computer aided transcription.

**U.S. District Court, Middle District of PA**

1

I N D E X

2

**18 JANUARY 2022**

Page

3

4 **Plaintiff's Rebuttal Witness**:

5 <u>Dr. Carl Hasselman, M.D.</u>: (*via ZOOM video conference*)

6 Direct examination by Michael Foley                    4
  Cross examination by Mr. Feeney                       12
7 Cross examination by Mr. Wenner                        12
  Redirect by Michael Foley                         17, 20
8 Recross by Mr. Feeney                                  20
  Recross by Mr. Wenner                                 20

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2          (Trial resumed at 2:26 p.m.)

3          THE COURT: Okay. Please be seated.  All right,

4   Mr. Foley, you may call your rebuttal witness.

5          MICHAEL FOLEY: Your Honor, we're going to recall

6   Dr. Carl Hasselman.  Hi, Doctor, how are you doing?

7          THE WITNESS: I am good.  How are you all? Can you

8   hear me okay.

9          MICHAEL FOLEY: Yes.  Swear the witness?

10          (Dr. Carl Hasselman, M.D. was recalled to testify and

11   was sworn by the courtroom deputy.)

12          DIRECT EXAMINATION BY MICHAEL FOLEY:

13   **Q.**   Dr. Hasselman, we took the deposition of Dr. Humbyrd on

14   Saturday morning, January 15th of 2022. Have you had an

15   opportunity to review her testimony?

16   **A.**   I have.

17   **Q.**   I want to address some narrow issues with you on rebuttal.

18   Will you give your opinions to a reasonable degree of medical

19   certainty?

20   **A.**   I will.

21   **Q.**   Doctor, in her testimony on page 27 Dr. Humbyrd raised the

22   issue of performing surgery percutaneously on, based on the

23   presentation on June 8th, 2016 of Mrs. Hunter when she saw

24   Dr. Smith.  She said that percutaneously based on the medical

25   records showing that the patient was quite swollen that she

1   would do it percutaneously. This was day 23.  First of all, did

2   Dr. Smith offer percutaneous surgery to Mrs. Hunter on June 8th

3   based on the records?

4   **A.**   She did not.

5   **Q.**   What did she offer?

6   **A.**   She offered open reduction internal fixation, or external

7   fixation.

8   **Q.**   Did she put a word in front of open reduction internal

9   fixation?

10   **A.**   She said possible.

11   **Q.**   Or attempted?

12   **A.**   Attempted, correct.

13   **Q.**   You had -- never mind.  What's the difference between

14   percutaneous surgery and open reduction internal fixation?

15   **A.**   Okay.  So when we talk about calcaneus fractures we talk

16   about open reduction internal fixation.  In that situation

17   we're going to make a relatively large incision, or a long

18   incision, it's probably almost ten inches long around the heel

19   bone.  We're going to pull all that skin and tissue up and

20   expose the heel bone, or the calcaneus, and then we're going to

21   use plates and screws and put the pieces back together,

22   literally watching, looking right at the pieces and putting

23   them back together.

24         That's open reduction internal fixation, meaning big

25   incision, big surgery, literally watching the pieces go back

1  into place, kind of like putting a jigsaw puzzle together.

2  Now, when we talk about percutaneous, which is also called

3  minimally invasive surgery, percutaneous means we're going to

4  make little stab incisions through the skin and then use

5  special tools, like a very small spatula or a very small dental

6  pick, these are some of the tools, and under x-ray guidance

7  we're going to try to visualize using x-ray the pieces going

8  back together, and then we can put small screws through the

9  skin into the bone pieces to hold them together.

10        The nice thing about percutaneous surgery is

11  especially if someone is swollen you can avoid the big

12  incision, because when someone is swollen you don't want to

13  make that big incision, because then we have problems with

14  wound healing and things of that nature.  Percutaneous surgery

15  allows you to put the pieces back together with a very small

16  incision. The problem with percutaneous surgery is that it

17  really only can be done within the first two weeks of surgery

18  of the injury, because we have to be able to move and shift the

19  pieces using the very small instruments, remember making very

20  small stabs in the skin.

21        So the instruments we have to use are very small.  I

22  mean, they're small as a pencil, and so like you use this

23  little pencil or special instrument to push the pieces, but

24  they have to be able to move in order for us to do that.  By

25  two weeks they're getting sticky, and by three weeks they're

1   very sticky, and so being able to push them apart you wouldn't

2   be able to separate them, and that's why you'd have to go to

3   open reduction so you can actually use bigger tools that

4   actually almost try to piece them together and put them back

5   where they belong.

6   **Q.**   Was -- do you have an opinion as to whether or not

7   percutaneous surgery was a viable option for correcting

8   Mrs. Hunter's condition on June 8th, 2016 as suggested by

9   Dr. Humbyrd?

10  **A.**   It is not, for two reasons.  One, in my own practice of

11  over twenty years doing this, and percutaneous surgery really

12  became popular around 2010, and I've been doing them in my

13  practice for those ten, twelve years.  It's not a viable option

14  because you're not going to be able to separate the pieces.  In

15  my own practice I wouldn't offer it to a patient for an injury

16  because you just can't pry the pieces apart.  Second of all,

17  there's quite a bit of literature out there showing that

18  percutaneous surgery really has to be done within two weeks

19  from the time of injury because, you know, the pieces have

20  already started to stick together.

21  **Q.**   Okay.  Doctor, Mrs. Hunter had a -- strike that.  Dr.

22  Humbyrd also testified that or suggested that trauma at the

23  time of that, if you have trauma at the time of injury, that

24  that causes irreversible arthritis or severe arthritis.  What's

25  the purpose of open reduction internal fixation?

**A.**    So the purpose of open reduction internal fixation is that
we know when the pieces have been broken and shifted, by going
in and putting the pieces back where they belong we can hope to
prevent the development of arthritis in the joint by basically
putting the calcaneus, or heel bone, back in its alignment and
restoring the surface of the joint we can prevent arthritis in
a lot of these fractures.

**Q.**    Okay.  Is the development of severe arthritis a given just
because you have a flaw that causes a two way fracture?

**A.**    Yes.  I did have a chance to review Dr. Humbyrd's
testimony, and in there she says she tells her residents in the
emergency rooms tell them they're going to have arthritis, my
argument is then why do we even bother fixing these things if
they're all going to develop arthritis as she testified.  Roy
Sanders, and I know this has been mentioned before, but he
developed the classification system, and it wasn't just so we
could describe fractures.  He developed the system because we
can describe it.  But we can also predict who will do well with
surgery and who will do not.

So we know that a Sanders Type 1 will do well without
surgery.  We know that a Sanders Type 2, whether it's A, B, or
C, will do well if the bones are anatomically put back, the
pieces are put anatomically back where they belong.  Type 3, we
know these people most likely will develop arthritis.  And Type
4 we know will go on to arthritis. And so Roy Sanders didn't

1 just classify it, but his classification system said the reason

2 we classify is so we know who will do well with surgery and who

3 will not.  And the Sanders Classification Type 2, which is what

4 Margaret Hunter had, a Type 2-A, will do well with open

5 reduction and internal fixation or percutaneous surgery if done

6 within the appropriate time limit.

7 **Q.**   And that would be within seven to fourteen days?

8 **A.**   Correct.  Excuse me.

9 **Q.**   And finally, Doctor, the last issue I want to talk to you

10 about is subtalar fusion.  You read what Dr. Humbyrd said about

11 subtalar fusion?

12 **A.**   I did.

13 **Q.**   What didn't she tell the jury?

14 **A.**   Okay.  So there are a few things that we need to talk

15 about.  Number one, remember in especially Margaret Hunter's

16 case, she didn't just damage the joint surface.  We also talked

17 about the heel bone when it broke, went into varus, which means

18 her heel bone turned inward instead of the normal slightly

19 outward, which you wanted.

20        So she actually has two problems.  First is the joint

21 and the second is the deformed heel bone.  And so when we talk

22 about her situation, if you fuse the joint her heel bone is

23 still going to be turned in, which is not the normal direction

24 of the heel bone.  More importantly, and that's Margaret

25 Hunter's case.  Now, when we talk about subtalar fusions the

1  problem with them is you even heard Dr. Humbyrd state that when
2  she has her patients go hiking she makes or she's showing a
3  person to wear high top boots.  She also said those who want to
4  do higher level activities to wear a brace, and the reason is
5  when we fuse the subtalar joint we're taking away side to side
6  motion of the ankle.

7          So remember your ankle moves up and down, but when
8  you do side to side motion, that's the subtalar joint.  So when
9  we fuse the subtalar joint, then you block that motion.  When
10 you lose that motion the ankle joint and the other two joints
11 in the foot called the talar navicular and calcaneal cuboid,
12 they have to pick up that lost motion from the subtalar joint.
13 And so we know that people who have subtalar fusions more
14 likely than not within twenty years will develop ankle
15 arthritis and arthritis of the talar navicular and the
16 calcaneal cuboid joint.  So although these patients may be able
17 to get to a certain level of activity, it's never normal and
18 they never go back to a lot of the high level activities that
19 we've discussed.
20 **Q.**   Well, she says that she's got people running 5 K's.
21 **A.**   Well, she does, but -- and that may be, and I've had
22 patients be able to ride bikes after subtalar fusions.
23 Remember what we just discussed is that these patients never
24 have normal activity.  Uneven surfaces are very difficult for
25 them because they can't accommodate that, and so if they're on

1  uneven surfaces they will stress their ankle and their foot to

2  compensate for that.  And so that's the problem with the

3  subtalar fusion.  It's not a normal ankle ever again.

4  **Q.**   Okay.  What's the difference between traumatic and

5  degenerative arthritis?

6  **A.**   So arthritis, when we talk about arthritis the problem

7  with it is some people just get wear and tear arthritis over a

8  period of time.  Post traumatic arthritis is arthritis that

9  develops after a trauma.  And so if you recall from my previous

10  testimony, we talked about arthritis, if the pieces are all put

11  back where they belong, then the chances of developing

12  arthritis are less because you restore the normal surface.

13  If you don't restore the surface, now you have a very abnormal

14  joint surface.  And so your arthritis will progress.

15      Furthermore, if it's not fixed when you address, when you

16  do a fusion post traumatic, if the pieces weren't put back

17  together where they belong the surgery is much more complicated

18  and much more difficult to do than if the pieces were where

19  they were and then they had their surgery to fuse it.  And so

20  that's the difference between the two in this case.

21  **Q.**   So why is it important, why -- is that an important

22  difference for a subtalar fusion? Or did you just explain that?

23  **A.**   Okay. So yes, so the point is if I had a Sanders 3

24  fracture that was displaced and I didn't fix it and I let it

25  heal, the surgery to fuse the joint would be very, very

1  difficult.  We'll even go, let's go make it simpler in Margaret

2  Hunter's case.  She had a Sanders 2-A, which means some of the

3  pieces have shifted or moved and the heel is turned in.

4        If I go in and fix that and put the pieces back where

5  they belong, even if she develops arthritis, the surgery to

6  fuse the joint is much easier and much more simpler and much

7  lower risk than when i, if I have to go back in when I fuse and

8  put the pieces back where they belong, because now I have to

9  fill in places that are shifted or moved with bone putty, and

10 sometimes that doesn't even work. And so it's a much more

11 complicated surgery in her case now that the bones have healed

12 in these abnormal positions.

13 **Q.**   When is the optimum time to perform that surgery?

14 **A.**   So the optimum time to perform open reduction internal

15 fixation is usually within two weeks of the injury.

16 **Q.**   Can you see where Dr. Humbyrd's said that if someone gets

17 a wound that's --

18        MR. FEENEY: Objection, Your Honor.

19 **Q.**   Okay, I'll withdraw, Judge.  Have all your opinions been

20 to a reasonable degree of medical certainty?

21 **A.**   They have.

22        MICHAEL FOLEY: Thank you, Doctor.  That's all I have.

23        THE COURT: Cross examine, Mr. Feeney?

24        CROSS EXAMINATION BY MR. FEENEY:

25 **Q.**   Dr. Hasselman, you've just testified that the chance of

1  arthritis was decreased if you put all the pieces back

2  together, right?

3  **A.**    That is correct, in a Sanders 2-A.

4  **Q.**    Okay.  So there is still the chance of arthritis even if

5  you put the pieces back together because of the damage to the

6  cartilage at the time of the injury, correct?

7  **A.**    So Roy Sanders --

8  **Q.**    Can you answer yes or no?  And then I'll let you explain.

9  **A.**    The answer is yes.

10  **Q.**    Okay.

11  **A.**    My explanation is where Sander said in a 2-A fracture, if

12  you fix it anatomically you have less than a ten percent

13  chance, one out of ten will develop arthritis.  The other nine

14  will do very well.

15  **Q.**    Doctor Hasselman, did you review the trial testimony of

16  Dr. Smith?

17  **A.**    Yes.

18  **Q.**    Not the discovery deposition.  The trial testimony.

19  **A.**    Yes, I did review that.

20  **Q.**    Okay.  And you would agree with me that Dr. Smith

21  testified that she recommended the surgery because she thought

22  the risks of the surgery or the benefit of the surgery

23  outweighed the risks, correct?

24  **A.**    That is correct.  But I also will go back and explain to

25  you, as I said in my testimony, she said attempted. She said,

1  "I will attempt this.  And if I can't do this, I will attempt

2  this."  She never said, "Yes, I can do it."

3  **Q.**  Well, she said in her trial testimony she could do it and

4  that's the reason she recommended it, right?

5  **A.**  She did.  She did.

6  **Q.**  Okay.  And she also said that she wouldn't have

7  recommended the surgery if she didn't think she was capable of

8  performing it, correct?

9  **A.**  She did make that statement.

10  **Q.**  Okay, and you would agree with me that if you had a

11  fractured extremity that was significantly swollen you wouldn't

12  put a cast on it, correct?

13  **A.**  Well, you would put a splint on it, yes.

14  **Q.**  You would put a splint on it.  You wouldn't put a cast on

15  it, correct?

16  **A.**  Correct.  But I think we need to understand --

17  **Q.**  Could I -- I'm sorry, I just didn't hear the answer.

18        MICHAEL FOLEY: Can he answer the question?

19        THE COURT: Certainly.

20        MR. FEENEY: Let me try it again, Doctor.  I didn't

21  mean to interrupt. I want to --

22        MICHAEL FOLEY: Can we ask the question again?

23        THE COURT: Let's -- did he answer the question?  I

24  don't know if he did.

25        MR. FEENEY: I don't know if he did.

```
 1          MICHAEL FOLEY: I couldn't hear.

 2          BY MR. FEENEY:

 3  Q.   Doctor, you would agree with me that if you had a

 4  significantly swollen limb you wouldn't put a cast on it,

 5  correct?

 6  A.   You would not put a cast on it.  You would put a splint on

 7  it.

 8          MR. FEENEY: Put a splint. Okay, that's all I have.

 9  Thank you, Doctor.

10          THE COURT: Mr. Wenner?

11          CROSS EXAMINATION BY MR. WENNER:

12  Q.   Thank you, Your Honor.  Good afternoon, Doctor.

13  A.   Good afternoon.

14  Q.   Just a couple of things.  You will agree, Dr. Hasselman --

15  strike that.  You indicated that you did have an opportunity to

16  read Dr. Smith's trial testimony, correct?

17  A.   I did.

18  Q.   And you saw where she did indicate to Mrs. Hunter that she

19  will most definitely have post traumatic arthritis. You saw

20  that in her testimony, didn't you, sir?

21  A.   I did.

22  Q.   And I want you to assume, Dr. Hasselman, that Dr. Paul

23  Medrek testified that regardless of the treatment that Margaret

24  Hunter had, she was going to develop post traumatic arthritis.

25  Assuming that to be true, do you agree or disagree with
```

1    Dr. Medrek?

2    **A.**    I disagree.

3    **Q.**    Thank you. Indicated that Mrs. Hunter when she had her

4    fall damaged the joint, correct?

5    **A.**    I agreed, yes.

6    **Q.**    Okay. And we're talking about the subtalar joint, correct?

7    **A.**    That is correct.

8    **Q.**    And arthritis -- strike that.  When an individual

9    fractures a bone, it is damage to the joint that may result in

10   post traumatic arthritis, correct?  It's the joint damage,

11   correct?

12   **A.**    So the joint damage, how extensive it is determines

13   whether they will develop arthritis or not.

14   **Q.**    And she damaged her joint according to your testimony just

15   maybe ten minutes ago, correct?

16   **A.**    That's correct. She had a Sanders 2, which is a slight

17   damage to the joint.

18   **Q.**    Did she damage the joint, Dr. Hasselman?  Yes or no.

19   **A.**    The answer is yes.

20   **Q.**    Sir, you've performed subtalar fusions I am sure, correct?

21   **A.**    That is correct.

22   **Q.**    And the purpose of performing a subtalar fusion is for

23   pain relief, fair?

24   **A.**    Fair.

25   **Q.**    It's an excellent surgery to help a patient with pain

1  relief, correct?

2  **A.**   It's the best one we have at this point.

3  **Q.**   And the pain relief that we're talking about in

4  Mrs. Hunter's case is from arthritis, correct?  Post traumatic

5  arthritis, true?

6  **A.**   We also know that she has a chronic pain syndrome, which

7  is not just from the joint, but the nerve endings around the

8  joint and things of that nature.  Things going on --

9  **Q.**   There's -- I'm sorry for interrupting.  I apologize, I

10  thought you were done, Doctor, please.

11  **A.**   No, I was just trying to help for you and the jury to

12  understand the concept of, you know, chronic pain --

13  **Q.**   Yes.

14  **A.**   -- if someone has had a painful joint for a period of

15  time.

16  **Q.**   Did Mrs. Hunter have pain, Dr. Hasselman, from post

17  traumatic arthritis?  Does she have that pain now?

18  **A.**   Yes.

19        MR. WENNER: Dr. Hasselman, thank you so much for your

20  time.  I appreciate it, sir.

21        REDIRECT BY MICHAEL FOLEY:

22  **Q.**   Dr. Hasselman, I have a few follow-up questions.  If

23  Dr. Kennedy had diagnosed the fracture on May 16, 2016, would

24  that have given Mrs. Hunter the best opportunity of avoiding

25  the traumatic arthritis pain that she's now suffering?

1  **A.**   Yes.

2  **Q.**   And the chronic nerve pain that she's suffering?

3  **A.**   Yes.

4  **Q.**   And the plantar fascitis pain?

5  **A.**   Yes.

6  **Q.**   And the tendon impingement pain?

7  **A.**   Yes.

8  **Q.**   What other types of pain is she having in her foot?

9  **A.**   Well, as we spoke, the subtalar arthritis.  The

10 compensatory irritation of the other joints such as the

11 calcaneous cuboid joint, which is one of the things Dr. Smith

12 had talked about.  These are the other joints, those are the

13 joints that have to compensate now because the heel is turned

14 inward in varus.

15 **Q.**   How did that, how do gait issues affect a person's

16 problems up and down their leg?

17         MR. FEENEY: Objection.  Scope, Your Honor.

18         MICHAEL FOLEY: It's in response to their discussion

19 of pain.

20         MR. FEENEY: I object, Your Honor.

21         THE COURT: I think we're going far afield of the

22 cross examination from both Mr. Feeney and Mr. Wenner.  So to

23 limit it to those three issues.

24         MICHAEL FOLEY: What do you mean by chronic pain --

25         THE COURT: Sustained, for the record.

1          MICHAEL FOLEY: Sorry, Judge.

2          REDIRECT CONTINUED BY MICHAEL FOLEY:

3    **Q.**   What do you mean by chronic pain?  What are you referring

4    to?  Can you explain that to the jury?

5    **A.**   Yes.  So instead of going on to hypotheticals or

6    theoreticals we'll stay straight with Margaret Hunter's case.

7    When your heel is now healed and it's turned inward and the

8    joint is in an abnormal shape, you'll have the pain from the

9    subtalar arthritis, as we've discussed. You'll have pain

10   because of the abnormal position of the heel.

11          As I even discussed in my previous testimony, when

12   the heel is turned inward it locks the front part of the foot

13   so that the normal walking pattern can't occur.  This causes

14   pain because the other joints gets stressed. The ankle gets

15   stressed, the talar navicular calcaneal cuboid joints get

16   stressed.  You also have these chronic pain fibers, so when you

17   deal with pain for a long time the brain actually starts to get

18   used to having that pain there.

19          It's similar to when people talk about phantom limbs,

20   people who have an amputation, they still have pain in their

21   leg even though they don't have a leg.  This is chronic pain

22   phenomenon well known.  In Mrs. Hunter's case I think she has

23   some of that that as well from living with this for so long.

24          MICHAEL FOLEY: Thank you, Doctor.

25          THE COURT: Any recross?

1          MR. FEENEY: Very briefly, Your Honor.

2          RECROSS BY MR. FEENEY:

3  **Q.**   Doctor, I want you to assume that Mrs. Hunter had this

4  surgery that Dr. Smith suggested, and the surgery was performed

5  successfully.  You'd agree with me that that would have

6  significantly reduced the chances of Mrs. Hunter having the

7  degree of arthritis she has now, correct?

8  **A.**   That is correct, but let me explain.  The reason you are

9  stating that she would have had a successful surgery, the

10 surgery would have been an open reduction internal fixation in

11 moderately swollen tissue, and the chances of the wound healing

12 are extremely low.  So you're giving a hypothetical situation,

13 but all the literature would say that wasn't going to happen.

14         MR. FEENEY: I have no other questions, Your Honor.

15         THE COURT: Mr. Wenner.

16         MR. WENNER: I believe just one.

17         RECROSS BY MR. WENNER:

18 **Q.**   Doctor, the purpose of the open reduction and internal

19 fixation surgery as proposed by Dr. Smith and as rejected by

20 Mrs. Hunter was to restore the heel anatomy.  Fair to say?

21 **A.**   That is fair to say.

22         MR. WENNER: Thank you, sir.

23         REDIRECT BY MICHAEL FOLEY:

24 **Q.**   Was it also to restore the anatomy of the subtalar joint

25 if it was going to be done?

1  **A.**   Yes.

2  **Q.**   But the operating on a swollen limb --

3          MR. WENNER: Objection, Your Honor.  This is going

4  well beyond now my single question.

5          THE COURT: I didn't hear the question.  I only

6  heard --

7          MR. WENNER: Well, okay, I'm sorry, he's getting into

8  swelling.

9          THE COURT: Is that where you're going, Mr. Foley?

10          MICHAEL FOLEY: I was just going to ask him if

11  operating on a swollen limb presented a risk of surgical

12  failure.

13          MR. WENNER: I object.

14          THE COURT: Sustained.

15          MICHAEL FOLEY: Thank's, Judge.  That's all I have.

16          THE COURT: Anything further?

17          MR. FEENEY: Nothing, Your Honor.

18          MR. WENNER: Nothing, Your Honor.

19          THE COURT: Thank you, Doctor, for being available.

20          THE WITNESS:  Thank you, Your Honor.  Have a good

21  day, guys.

22          MR. FEENEY: Thank you.

23          MR. WENNER: You, too.

24          (Rebuttal testimony concluded at 2:57 p.m.)

25

1      **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3         **Hunter, et al., vs. Kennedy, et al.**

4                **3:17-CV-00007-JFS**

5    **Rebuttal Video-link Testimony of Dr. Carl Hasselman, M.D.**

6                **18 January 2022**

7

8         I, Wesley J. Armstrong, Federal Official Court

9    Reporter, in and for the United States District Court for

10   the Middle District of Pennsylvania, do hereby certify that

11   pursuant to Section 753, Title 28, United States Code that

12   the foregoing is a true and correct transcript of the

13   stenographically reported proceedings held in the

14   above-entitled matter and that the transcript page format is

15   in conformance with the regulations of the Judicial Conference

16   of the United States.

17

18              Dated this 21st day of January 2022

19

20

21

22              **/s/ Wesley J. Armstrong**

23              _____

24              **Wesley J. Armstrong**

25              **Registered Merit Reporter**

**U.S. District Court, Middle District of PA**